# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  50316-6-II |
| Respondent, | |
| v. | |
| CHRISTOPHER ERIC BURTON, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Christopher E. Burton appeals his conviction and sentence for residential burglary with a deadly weapon sentencing enhancement.  Burton argues that the trial court abused its discretion by admitting recordings of a 911 telephone call from Burton's girlfriend and a telephone call from Burton to his mother while he was in jail.  We hold that the trial court abused its discretion by admitting the 911 and jail call recordings.  Accordingly, we reverse and remand for a new trial.[1]

---

[1] In his opening brief and a statement of additional grounds (SAG), Burton raises several additional issues.  Because we reverse based on the erroneous admission of the 911 and jail telephone call recordings, we do not address any issues other than Burton's claim that the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to disclose evidence.

FACTS

I. BACKGROUND FACTS

At 2:46 A.M. on July 5, 2016, Virginia Lord[2] called 911 from Seattle to report being assaulted by her boyfriend, Burton. At one point during the call, Burton resumed beating Lord. The call ended after Burton left Lord's home. Lord and another person identified Burton by name and described his clothing and his truck. Later that morning, Burton wrecked his truck in a ditch while driving in a rural area near Longview.

Evelyn Plant encountered the wrecked truck when she was returning to her nearby home. Plant stopped to investigate the wreck but could not locate the driver. Another driver who had stopped to check on the wreck called 911 and reported the crash. Plant then returned to her home. Upon entering her home, Plant noticed a plastic Dr. Pepper bottle on the counter that had not been there when she left. Plant then noticed that the door to her utility room was ajar. When Plant entered the utility room, she encountered Burton walking up the stairwell from her basement with his hands in the air.

Plant ordered Burton to leave her home. Burton told Plant he was trying to hide from the police because his girlfriend had abused him and framed him, and that he needed to get away immediately. Burton explained that he had crashed his car while trying to look at Facebook on his phone and that he did not want to return to the crash because he did not want to get caught by police. Burton offered Plant money to drive him to the bus depot. Plant observed Burton as "[u]pset, scared, almost panicky," and nervous. Report of Proceedings (RP) at 403. After about

---

[2] Lord's surname has since changed to Burton. Because she and the appellant share a last name, we refer to her by her former name for clarity. We intend no disrespect.

ten minutes, Plant's significant other arrived at her home and began talking to Burton. Plant went inside her home and called 911.

When law enforcement arrived at Plant's home, Burton hid in nearby trees. A police officer saw Burton and told him to stop. Burton complied and briefly spoke with the police officers. When one of the officers told Burton he was investigating the accident that had occurred nearby, Burton ran. After a pursuing officer threatened to use a stun gun on him, Burton stopped. The officers arrested Burton and searched him for weapons.

An officer located a large knife in a sheath in Burton's waistband area. The knife belonged to Plant and was typically stored in a bin outside of her bedroom.

An officer then took Burton to a hospital where he was diagnosed with a concussion without loss of consciousness. Burton was then transported to jail.

Later that evening, Burton called his mother from jail. Burton told his mother that he had gone to Plant's house to call the police after his crash. Burton and his mother also discussed the incident in Seattle. When Burton's mother asked him where he was, Burton had to ask another person in the jail.

## II. PROCEDURAL FACTS

The State charged Burton with residential burglary with a deadly weapon sentencing enhancement, hit and run, and obstructing a law enforcement officer.

A jury found Burton not guilty of hit and run and guilty of obstructing a law enforcement officer. But the jury could not reach a verdict on the residential burglary with a deadly weapon sentencing enhancement. The trial court declared a mistrial on the residential burglary charge and

deadly weapon sentencing enhancement. The case proceeded to a second trial on the residential burglary charge and deadly weapon sentencing enhancement.

At the second trial, the State brought a motion in limine to admit recordings of Lord's 911 call and Burton's call from jail to his mother. The State argued that the recordings were admissible under ER 404(b) to show that when Burton entered Plant's home, it was with intent and motive to commit a crime by stealing a knife for its potential use in his flight from the alleged assault in Seattle. The State further argued that the recordings were admissible as res gestae evidence because Burton's knowledge of the prior allegation of assault and his subsequent flight represented "a link in the chain" of an unbroken sequence of events. Clerk's Papers (CP) at 123. Burton argued that the recordings were "much more prejudicial than probative in terms of what the effect would be on the jury." RP at 369.

The trial court admitted both the 911 call and the jail call "under both the res gestae exception and also the 404(b) exception." RP at 379. The trial court commented that it did not "think that the unfair prejudice rises to a level where it overpowers and becomes an issue of such a magnitude that the probative value shouldn't be seen by the jury." RP at 379. The trial court instructed the jury that it could only consider the calls "for the purposes of providing a complete picture and immediate context to the events of July 5, 2016, or for assessing motive, credibility, intent, knowledge, absence of mistake, or to rebut a material assertion." CP at 167.

Following opening statements, before calling any witnesses, the State played the 911 call for the jury. The recording began with Lord telling the 911 operator "I've been assaulted. My boyfriend came into my house. He's–well, my ex-boyfriend. He's intoxicated. . . . [H]e punched me in my ribs. He punched me in my back." RP at 383-84. Lord warned the operator that Burton

4

remained in her home. The recording then captured sounds of Lord screaming and crying, "Stop. Stop. Stop," and hitting sounds. RP at 385. The recording continued with the sound of Lord screaming and crying until another person spoke to the operator, explaining that Lord appeared to be "hurt quite badly," noting "[t]here's quite a bit of blood." RP at 386. The other person asked the operator to respond "as fast as possible" because she was "a little nervous" and gave the operator a description of Burton and his truck. RP at 386. The recording concluded with Lord back on the line, saying, "It was Christopher Burton. . . . He was hitting me really hard at first. Yeah, he was beating me[.]" RP at 389.

Later in trial, before the State played the recording of the jail call between Burton and his mother, Burton renewed his objection to the admission of the jail call. Burton argued that because his mother, during the call, referred to a rape allegation stemming from the Seattle incident, the call was "even more inflammatory." RP at 497. The State argued that the jail call should be admitted because the call showed Burton was in flight, knew Lord made allegations against him in Seattle, "and the magnitude of that situation is part of why we argue that he broke in[to] a house, armed himself with a weapon, [and] was so desperate to get away from the police." RP at 500. The trial court admitted the jail call but required the State to skip any reference to rape on the recording.

On the recording, Burton told his mother he had wrecked his truck and walked to a nearby house to call the police. Burton and his mother also discussed the incident in Seattle. Burton told his mother, "That stuff is absolutely not true." "She's been trying to set me up for a while and she finally (unintelligible) it." RP at 540. Burton asked his mother, "So I take it she went to the police and called the court and blah, blah, blah?" RP at 541. Burton's mother replied, "I sent you the

5

information. She sent me pictures of her at the hospital beat up." RP at 541. Burton asked his mother to bail him out of jail, but she refused. The call continued:

> [Burton]: I'm going to tell you about something. So when we had sex first, right, and she smelled (unintelligible), right, and it was gross and I said something and she lashed out, went to the phone and called the fucking cops. I'm trying to get the fuck out, but she attacks me, starts screaming and then it ends up in an altercation. That's exactly what happened, mom.
>
> [Mother]: Well, then you tell it to the judge. Like I say, I mean, it is what it is. Would I bring the money to help you? I don't have the time to come up here. That is a conversation that you have with the judge. I don't know what to tell you. I mean, any man that would (unintelligible) me and then have the nerve to say that, I'd want to bash your face in.
>
> [Burton]: Ma, it was gross, it was (unintelligible).
>
> [Mother]: It doesn't matter. It doesn't matter. Wasn't too dirty for you to have sex with her.
>
> [Burton]: All right. I can't believe she's doing that to me.
>
> . . . .
>
> Her goal is to completely bury me, you know that? Completely bury me.
>
> [Mother]: Christopher, everyone within a thousand miles told you to stay away from her.
>
> . . . .
>
> [Burton]: I guess I'm just going to fight this and fight that and it ruins everything and just sit here. I was literally coming home. I was on my way home. I just couldn't take any more. I was coming home.
>
> . . . .
>
> [Mother]: What? Where are you?
>
> [Burton]: I'm out in the middle of – hey, what town is this? Longview, thank you. Longview.

RP at 542-45.

Burton testified that he wrecked his truck because he was trying to turn on his cellular phone to call a friend. After the wreck, he walked away from the truck and encountered a home, later identified as Plant's home. He testified that he did not remember having a conversation with

6

Plant, but he also testified that he encountered Plant on her porch and that she told him to leave. Burton recalled a man arriving, but Burton did not remember talking to him. Burton also testified that he did not remember running from law enforcement, being taken to the hospital, or possessing the knife.

The jury found Burton guilty of residential burglary and entered a special verdict finding that he was armed with a deadly weapon at the time of the burglary. The trial court sentenced Burton to 77 months confinement, including 12 months for the deadly weapon sentencing enhancement.

Burton appeals.

## ANALYSIS

Burton argues that the trial court abused its discretion by admitting recordings of the 911 telephone call and the jail telephone call. We agree.

### I. LEGAL PRINCIPLES

We review the trial court's ruling to admit or exclude evidence of misconduct for an abuse of discretion. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). A trial court abuses its discretion if it admits evidence contrary to law, or when its decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Quaale*, 182 Wn.2d 191, 196-97, 340 P.3d 213 (2014).

Evidence of a defendant's prior misconduct is generally not admissible "to demonstrate the accused's propensity to commit the crime charged." *State v. Fisher*, 165 Wn.2d 727, 744, 202 P.3d 937 (2009); ER 404(b). However, ER 404(b) allows for the introduction of evidence of prior misconduct for other purposes, such as showing motive or intent. *Fisher*, 165 Wn.2d at 744.

"We read ER 404(b) in conjunction with ER 403," which "requires the trial court to exercise its discretion in excluding relevant evidence that would" unfairly prejudice the accused. *Fisher*, 165 Wn.2d at 745. Prior to admitting misconduct evidence, the trial court "must (1) find by a preponderance of the evidence [that] the misconduct actually occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence [in proving] an element of the crime, and (4) weigh the probative value [of such evidence] against [its] prejudicial effect." *Fisher*, 165 Wn.2d at 745. Even if evidence is admissible under one of ER 404(b)'s exceptions, it must still be excluded if the unfair prejudice substantially outweighs the evidence's probative value. *State v. Fuller*, 169 Wn. App. 797, 829-30, 282 P.3d 126 (2012). "'[U]nfair prejudice' is caused by evidence that is likely to arouse an emotional response rather than a rational decision among the jurors." *State v. Rice*, 48 Wn. App. 7, 13, 737 P.2d 726 (1987).

Res gestae evidence is evidence that completes the story of the crime on trial by proving the context of events near in time and place to the commission of the crime. *State v. Grier*, 168 Wn. App. 635, 647, 278 P.3d 225 (2012). Res gestae evidence also allows the party presenting the evidence to depict a complete picture for the jury. *Grier*, 168 Wn. App. at 647. Res gestae evidence "constitutes a 'link in the chain' of an unbroken sequence of events surrounding the charged offense." *State v. Brown*, 132 Wn.2d 529, 571, 940 P.2d 546 (1997) (quoting *State v. Tharp*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981)). Collateral prior crimes are admissible as res gestae when they complete the story of a crime "'by proving its immediate context of happenings near in time and place'." *State v. Tharp*, 27 Wn. App. 198, 204, 616 P.2d 693 (1980) (quoting E. Cleary, McCormick's Law of Evidence s 190, 448 (2d ed. 1972)).

We review res gestae evidence under ER 401, 402, and 403. If the res gestae evidence is relevant under ER 401, then it is generally admissible under ER 402, unless its potential prejudice outweighs its probative value under ER 403. *Grier*, 168 Wn. App. at 646, 649; *State v. Briejer*, 172 Wn. App. 209, 225, 289 P.3d 698 (2012). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. If a logical nexus exists between the evidence and the fact to be established, evidence is relevant. *Briejer*, 172 Wn. App. at 225-26. But relevant evidence may nonetheless "'be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Briejer*, 172 Wn. App. at 226 (quoting ER 403).

## II. ABUSE OF DISCRETION

### A. 911 TELEPHONE CALL

Here, the State offered the recording of the 911 telephone call to show that Burton's intent and motive for unlawfully entering Plant's home and stealing her knife was to run away from law enforcement following the serious incident in Seattle.

Assuming without deciding whether the 911 call fell under an ER 404(b) exception or was res gestae evidence, we hold that the danger of unfair prejudice from the 911 telephone call recording substantially outweighed its probative value. To be admitted under either an ER 404(b) exception or as res gestae evidence, evidence must be more probative than prejudicial. *Fuller*, 169 Wn. App. at 829-30; *Grier*, 168 Wn. App. at 649. Such is not the case here.

The 911 telephone call recording, played for the jury before any witness took the stand, contained the sounds of Burton violently beating his girlfriend while she screamed and begged

9

him to stop. The recording contained reports from another person that "[t]here's quite a bit of blood," and pleas for the medics to come "as fast as possible." RP at 386. The recording painted Burton as a violent and dangerous man and likely inflamed the passions of the jury. Thus, any probative value the 911 call may have had relating to Burton's intent and motive for entering Plant's house was substantially outweighed by the danger of unfair prejudice arising from the contents of the call. Accordingly, the trial court abused its discretion by admitting the highly prejudicial 911 call recording.

B.  JAIL TELEPHONE CALL

We further hold that the trial court also abused its discretion by admitting the jail telephone call recording as ER 404(b) and res gestae evidence. The jail call recording does not qualify as res gestae evidence because it was made many hours after the incident and was not part of an "unbroken sequence of events surrounding the charged offense." *Brown*, 132 Wn.2d at 571. And the jail call was also inadmissible as ER 404(b) evidence.

The State offered the jail telephone call to show how serious the incident was in Seattle and also to show Burton's intent in stealing Plant's knife. As previously discussed, ER 404(b) evidence is admissible to show motive and intent. *Fisher*, 165 Wn.2d at 744. However, the conversation on the jail call recording consisted primarily of Burton telling his mother his version of the events in Seattle, mitigating the incident, and discussing his dysfunctional relationship with Lord. Any connection between Burton's conversation with his mother and his intent and motive for unlawfully entering Plant's home was attenuated and speculative at best.

Moreover, the jail call further focused the jury on the Seattle assault, and the cavalier discussion Burton had with his mother about "gross" sex with Lord likely only accentuated the prejudicial effect of the evidence. Thus, any probative value offered by the jail call recording was substantially outweighed by the risk of unfair prejudice. Consequently, the trial court also abused its discretion by admitting the jail call recording.

### III. NOT HARMLESS ERROR

We further hold that the erroneous admission of the recorded 911 and jail telephone calls was not harmless.

A trial court's improper admission of evidence generally is a nonconstitutional error that requires reversal only if the evidence materially impacted the trial's outcome. *State v. Beadle*, 173 Wn.2d 97, 120-21, 265 P.3d 863 (2011). Erroneous admission of evidence is harmless unless there is a reasonable probability that, but for the error, the verdict would have been materially different. *State v. Ashley*, 186 Wn.2d 32, 47, 375 P.3d 673 (2016). In addition, improper admission of evidence constitutes harmless error if the evidence is of only minor significance in reference to the evidence as a whole. *State v. Rodriguez*, 163 Wn. App. 215, 233, 259 P.3d 1145 (2011).

These improperly admitted telephone call recordings were not of minor significance. The 911 call contained graphic audio of a violent crime in progress that would only invoke an emotional response from the jury. The spectre of the violent incident in Seattle permeated the entire trial, taking a central role in the State's theory of the case. The jail call recording, which captured Burton cavalierly recalling having sex with Lord to his mother, likely accentuated the jury's emotional response to the violent 911 call. Given the highly prejudicial impact of the telephone calls, and the prominent role the calls played in the prosecution, there is a reasonable probability that the

11

erroneous admission of the 911 and jail calls materially impacted the trial's outcome, and therefore, the trial court's errors were not harmless.

Accordingly, we reverse Burton's conviction for residential burglary with a deadly weapon sentencing enhancement and remand for a new trial.[3]

---

[3] In his SAG, Burton also argues that the State committed *Brady* violations by suppressing photographs during the first trial that the State later offered for admission in the second trial, including a photograph of Burton's wrecked truck, various photographs of Plant's home and neighborhood, and a photograph of a street sign. Because this is a constitutional argument that could arise again on remand, we exercise our discretion and address this argument. We hold that Burton's claims fail because the record does not support his argument that any *Brady* violations occurred.

We review an alleged *Brady* violation de novo. *State v. Mullen*, 171 Wn.2d 881, 893-94, 259 P.3d 158 (2011). *Brady* imposes a duty on the State to disclose material evidence favorable to the defendant. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963). To establish a *Brady* violation, a defendant must demonstrate the existence of each of three elements: "'[(1)] the evidence at issue must be favorable to the accused . . . ; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued.'" *Mullen*, 171 Wn.2d at 895 (some alternations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. 2d. Ed. 286 (1999))

Burton fails to make any argument that the unintroduced photographs meet any of the elements of a *Brady* violation. Burton offers no argument, and this court can think of none, as to how the photographs would have been favorable to Burton or how their absence from the first trial caused him any prejudice. In the first trial, the jury found Burton not guilty of the hit and run charge and hung on the residential burglary charge. In the retrial for residential burglary, when these various additional photographs were admitted, the jury found Burton guilty. We hold that Burton's claims fail because the record does not support his argument that any *Brady* violations occurred.

No. 50316-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON. J.

We concur:

, A.C.J.

LEE, A.C.J.

NEVIN, J.P.T.